UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————

DAVID M. SCHMIDT,

                 Plaintiff,

vs.                                             Case No.: 1:22-cv-00420-JLS-MJR

PROVIDENT LIFE AND CASUALTY
INSURANCE COMPANY and
UNUM GROUP,

                 Defendants.

———————————————————

## **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**RUPP PFALZGRAF LLC**
Attorneys for Defendants,
Provident Life and Casualty Insurance Company and
Unum Group
R. Anthony Rupp III, Esq.
Matthew D. Miller, Esq.
Young Woo Kim, Esq.
1600 Liberty Building
Buffalo, New York 14202
(716) 854-3400
Rupp@RuppPfalzgraf.com
Miller@RuppPfalzgraf.com
Kim@RuppPfalzgraf.com

# TABLE OF CONTENTS

Page No.

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL AND BACKGROUD ................................................................................. 2

SUMMARY JUDGMENT STANDARD ..................................................................... 3

ARGUMENT ................................................................................................................ 4

POINT I
    PLAINTIFF HAS NOT ESTABLISHED AS A MATTER OF LAW
    THAT HE IS "RESIDUALLY DISABLED" ........................................................ 4

    A. Summary Judgment is Improper When There
       is a "Clash of Experts" ................................................................................... 4

        1) Medical Record Review and Termination of Benefits ................. 5

        2) Appeal Process ................................................................................ 8

        3) Clash of Experts ............................................................................ 10

    B. There are Genuine Issues of Material Fact as to Whether
       Mr. Schmidt's Alleged Restrictions and Limitations Qualify
       for Residual Disability ................................................................................. 11

    C. There is Sufficient Evidence in the Record to Show that Plaintiff
       Could Have Performed the Material and Substantial Duties of His
       Occupation with Monocular Vision ........................................................ 13

        1) Plaintiff has Demonstrated that he Could Adequately
          Perform His Job ............................................................................ 14

        2) It is Disputed Whether Plaintiff was Able to Bring Adaptive
          Measures to Client Sites ............................................................... 15

    D. There is a Dispute as to Whether Plaintiff's Departure from EY,
       and thus his Loss of Earnings, was Caused by his Alleged Disability .... 16

POINT II
    UNUM HAS NOT ACTED IN BAD FAITH IN DETERMINING
    PLAINTIFF'S ELIGIBILITY FOR DISABILITY BENEFITS, AND
    UNUM WAS NOT INVOLVED WITH EY'S DECISION UNDER ITS
    OWN PROGRAM ......................................................................................... 17

A.  Plaintiff Failed to Make a Prima Facie Showing of Unum's
    Alleged Bad Faith in Denying Plaintiff's Disability Claim,
    Precluding Summary Judgment. ................................................................  17

B.  Plaintiff Failed to Demonstrate a Prima Facie Entitlement to
    Consequential Damages ..............................................................................  21

CONCLUSION .................................................................................................  24

## TABLE OF AUTHORITIES

Page No.

## CASES

*25 Bay Terrace Assocs. L.P. v. Pub. Serv. Mut. Ins. Co.,*
144 A.D.3d 665 (2d Dep't 2016) ........................................................ 18

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) .............................. 3

*Augustine v. Hee,* 161 Fed. App'x 77, 79 (2d Cir. 2005) .................................. 11

*Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988) ........................ 3

*Cohen v. Narragansett Bay Ins. Co.,* 2014 U.S. Dist. LEXIS 134092 at *4
 (E.D.N.Y. Sept. 23, 2014, No. 14-CV-3623 (PKC)) ........................................ 22

*Colwell v. Suffolk County Police Dept.,* 158 F.3D 635, 643 (2d Cir. 1998) ...................... 4

*Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) ........................ 3

*East Ramapo Cent. Sch. Dist. v. New York Sch. Ins. Reciprocal,*
199 A.D.3d 173 (2d Dep't 2021) ........................................................ 18

*Ebrahimian v. Nationwide Mutual Fire Ins. Co.,* 960 F.Supp.2d 405, 416 (EDNY 2013). 18, 22

*Dawn Frosted Meats, Inc. v. Ins. Co. of N. Am.,* 99 A.D.2d 448 (1st Dept. 1984) ............. 18

*Gordon v. Nationwide Mut. Ins. Co.,* 30 N.Y.2d 427, 437 ................................ 18

*Harris v. Provident Life & Accident Ins. Co.,* 310 F.3d 73, 79 (2d Cir. 2002) ................... 4

*Hudson Riverkeeper Fund v. Atlantic Richfield Co.,*
138 F. Supp2d 482, 490-91(S.D.N.Y. 2001) .............................................. 4

*McBride v. New York Prop. Ins. Underwriting Ass'n,* 152 A.D.3d 505 (2d Dep't 2017) ... 18

*Napoli v. First Unum Life Ins. Co.,* 78 Fed. App'x 787 (2d Cir. 2003) ............................ 11

*Rich v. Tee Bar Corp.,* 2013 U.S. Dist LEXIS 10682,
 at *23 (N.D.N.Y. Jan. 28, 2013, No. 1; 10-CV-1371) (MAD/CFH) ................................ 11

*Sunrise One, LLC v. Harleysville Ins. Co. of NY,*
293 F. Supp.3d 317, 328 (E.D.N.Y. 2018) .......................................... 18, 19, 22

*Sukup v. State of New York,* 19 N.Y.2d 519 (N.Y. 1967) .............................. 18, 19

*Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.,* 283 F. Supp3d 314, 329 (NDNY 2017).. 18

*Valentini v. Group Health Inc.,* 2021 U.S. Dist. LEXIS 112081 ........................ 22

*Whitlow v. Visiting Nurse Ass'n,* 420 F.Supp3d 92, 105 (W.D.N.Y. 2005) ........................ 4

Page No.

**LOCAL RULE**

Loc. R. Civ P. 56(a)(2) ................................................................. 2

FRCP 56(a) and 56(c) ................................................................. 3

## **PRELIMINARY STATEMENT**

Defendants Provident Life and Casualty Insurance Company ("Provident") and Unum Group (collectively "Unum")[1] underwent an exhaustive and multi-faceted review of all of Plaintiff's provided medical and vocational information[2] prior to terminating Plaintiff's long-term disability benefits as of April 1, 2021, and again after Plaintiff administratively appealed. At the heart of this case are material factual disputes by medical professionals regarding the objective medical evidence and lack of support for Plaintiff's self-reported and self-serving subjective complaints. Although Unum initially approved Plaintiff's claim for total disability benefits in January of 2019, it later learned that Plaintiff did some consulting work and actively was seeking job opportunities since he no longer was an audit partner at Ernest & Young ("EY"). Throughout, this case has involved warring experts in disagreement as to whether Plaintiff's eye condition supports restrictions and limitations that prevent him from performing the duties of his job as an audit partner. After careful consideration of Plaintiff's circumstances, including medical records, submissions from the Plaintiff himself, and from his medical and vocational providers, Unum determined that Plaintiff no longer was entitled to full or residual disability

---

[1] Provident Life and Casualty Insurance Company is a wholly-owned subsidiary of Unum Group (see Dkt. 11) and issued the Policy at issue in this action. For ease of reference, defendants collectively will be referred to as "Unum."

[2] Unum's comprehensive and exhaustive review is captured in two PDF files, the "Policy" at issue and the "Claim File." The Claim File was conventionally filed in hard copy and on a disc and sealed by the Court on April 26, 2024 (Dkt. 41) in response to defendants' motion (Dkt. 39). Both previously were produced to Plaintiff. The Policy and Claim File are authenticated by the Declaration of Shannon Cartier, sworn to on April 22, 2024, and are attached thereto as Exhibits A and B, respectively – which accompany these papers in opposition to Plaintiff's motion for summary judgment. Each file contains a unique Bates number identifier. Those are (1) Policy - PLC-IDI-DUP-POL-000001 – PLC-IDI-DUP-POL-000067 and (2) Claim File - PLC-CL-IDI-000001 – PLC-CL-IDI-000906. Generally, "Policy" is used herein throughout to refer to the Policy and "Claim File" is used herein throughout in citations to refer to the Claim File. Specific portions of the Policy or Claim File may be cited to and identified in various declarations accompanying this opposition and/or by the Bates identifiers set forth in this footnote (i.e. "Claim File at 451" or "Policy at 44").

benefits because restrictions and limitations preventing him from performing the duties of his job no longer were supported. The medical evidence and conclusions together with Plaintiff's own deposition testimony strongly support Unum's decisions and demonstrate that summary judgment is inappropriate.

Ultimately, Unum's medical experts opined that Plaintiff had adapted to his monocular state and could perform the material and substantial duties of his occupation. In fact, Plaintiff testified that no one at EY ever complained or suggested that Plaintiff's performance was suffering after the injury to his left eye. Plainly, Plaintiff left EY because he wanted to, not because his ability to work or his performance was suffering. There are significant disputes in the record surrounding Plaintiff's claim that he cannot read as required. Moreover, Plaintiff's claim that a large portion of his work (at EY client sites) was unable to accommodate adaptive measures is belied by Plaintiff's own testimony. Simply put, there are substantial disputed issues of material fact that make summary judgment for the Plaintiff inappropriate and requiring a trial.

Lastly, Plaintiff's argument that Unum acted in bad faith in denying his claim to disability benefits is meritless and without support in the record, especially considering the extensive documented steps Unum took throughout its claims analysis. Plaintiff's bad faith claim entirely is conclusory and fails to meet the high burden imposed on Plaintiff for such a claim. Plaintiff's motion for summary judgment should be denied in its entirety, and this action should be set down for trial.

## **FACTUAL BACKGROUND**

The facts supporting Unum's opposition to Plaintiff's motion for summary judgment are set forth in Unum's accompanying response to Plaintiff's statement of material facts and counter statement pursuant to Loc. R. Civ. P. 56(a)(2), the declaration of R. Anthony

2

Rupp III, Esq., as well as in the declaration of Rachel A. Duchon, to which the Court respectfully is referred.

## SUMMARY JUDGMENT STANDARD

Summary judgment may not be granted unless the "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a) and 56(c). The moving party bears the burden of establishing that no genuine issues of material fact exist, and courts must view the facts and resolve all ambiguities in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If, as to the issue on which summary judgment is sought, there is *any* evidence in the record from *any* source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995) (citing *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).

# ARGUMENT

## I.    PLAINTIFF HAS NOT ESTABLISHED AS A MATTER OF LAW THAT HE IS "RESIDUALLY DISABLED"

### A.    Summary Judgment is Improper When There is a "Clash of Experts"

Summary judgment is not favored in cases involving materially conflicting expert reports. *See Harris v. Provident Life & Accident Ins. Co.,* 310 F.3d 73, 79 (2d Cir. 2002) (district court erred in granting summary judgment to insured in breach of contract claim for disability benefits because conflicting medical reports concerning plaintiff's latex allergy and ability to return to work created a genuine issue of material fact as to whether insured was "totally disabled" and entitled to benefits under the insurance policy); *Hudson Riverkeeper Fund v. Atlantic Richfield Co.,* 138 F. Supp. 2d 482, 490-91 (S.D.N.Y. 2001) (finding that "in light of the disputes between the various experts, . . . genuine issues of material fact exist as to whether the [allegedly contaminated site] presents an imminent and substantial endangerment to health or the environment . . . .").

This is also true when the clash of experts involves the question of the effect of physical impairment on a plaintiff's ability to function. *See Whitlow v. Visiting Nurse Ass'n,* 420 F. Supp. 2d 92, 105 (W.D.N.Y. 2005) ("The question whether a particular plaintiff is substantially limited in the major life activity of "working" requires an "individualized and fact-specific" inquiry, generally not well-suited for summary judgment." quoting *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 643 (2d Cir. 1998)).

This case necessarily is a clash of experts.  In summary, there are three major disagreements between experts: 1) whether Plaintiff could perform sustained critical reading for several hours; 2) whether Plaintiff fully adapted to monocular vision after the loss of vision in his

left eye; and 3) whether the subjective self-reports of headaches and fatigue were the result of the loss of vision or something else not related to his alleged disability. It is important to note that Plaintiff's objective eye examination results are not disputed, but the interpretation by medical professionals of the impact of those results are, which is subjective.

To demonstrate the nature of the clash of experts in this matter, a summary of the process Unum took in reviewing Plaintiff's disability claim is necessary.

## 1) <u>Medical Record Review and Termination of Benefits</u>

Unum learned in late 2020 that Plaintiff had performed work in some capacity and was pursuing job opportunities, which could signify a change in circumstances. (Claim File 302). As a result, Unum began reviewing whether Plaintiff's original restrictions and limitations continued to be supported. Because the claim file and medical documentation had not been reviewed since 2018 when restrictions and limitations originally were supported, Unum's Senior Clinical Consultant, **Deborah Donohue, RN, BSN**, reviewed Plaintiff's medical records to see if there was a change in Plaintiff's medical condition. (Claim File at 451, Rupp Dec., Ex. E at 92). Due to the passage of time, additional medical records and information were made available to Unum, which triggered the review. (Rupp Dec., Ex. D at 182). Ms. Donohue noted that Plaintiff somehow began working in some capacity and retained a good right eye with 20/20 vision and suggested that this matter be referred to the Clinical Vocational Medical ("CVM") forum and reviewed by the on-site physician ("OSP") and vocational rehabilitation consultant ("VRC"). (Claim File at 542). Unum's OSP, **Joseph A. Antaki, M.D.**, noted that Plaintiff retained vision that should not prevent him from reading. (Claim File at 477-78 and Rupp Dec., Ex. E at 29-31). As a result of inconsistency between Dr. Antaki's opinion and the restrictions and limitations asserted by Plaintiff, Unum decided to conduct a full doctoral review and to contact Plaintiff's

attending physician ("AP").  The doctoral review refers to an exhaustive review of all the medical and vocational information, as well as contacting the AP, **Amy Suda, O.D.,** Plaintiff's treating optometrist.

As documented clearly in the Claim File, Dr. Antaki reached out to Dr. Suda on February 19, 2021, to discuss the restrictions and limitations had Dr. Suda put in place for Mr. Schmidt.  (Claim File at 465).  Drs. Antaki and Suda shared their opinions and assessments of Plaintiff's alleged restrictions and limitations.  Importantly, Dr. Suda agreed that "the acuity in the right eye 'is there'".  (Claim File at 469) .  However, Dr. Antaki disagreed as to whether the amount of reading claimed to be required for Plaintiff's job as an audit partner was something Plaintiff could tolerate.  (Claim File at 466, 469-470, Rupp Dec., Ex. E at 33-34).

To obtain clarification directly from Plaintiff regarding his vision status at the time, Unum reached out to Plaintiff on March 1, 2021 with questions. (Claim File at 487). Plaintiff replied by letter on March 9, 2021. (Claim File at 489 – 490).  Dr. Antaki reviewed all medical information in the Claim File, including the March 9 letter from Plaintiff, and determined that the information he received from Dr. Suda and Plaintiff did not change his prior conclusion that restrictions and limitations were not supported precluding Plaintiff from the performance of his occupational demands.  (Claim File at 500, Rupp Dec., Ex. E at 65).

For an additional review, Dr. Antaki referred the claim to Unum's designated medical officer ("DMO"), **Richard Eisenberg, M.D.,** board-certified ophthalmologist (Claim File at 500-501, Rupp Dec., Ex. E at 65).  Dr. Antaki asked Dr. Eisenberg whether he agreed with Dr. Suda, who opined that Plaintiff was unable to do extended reading/computer work, or whether he agreed with Dr. Antaki, who found that Plaintiff was not precluded from performing

tasks that do not require fine-depth perception. (Claim File at 501, Rupp. Dec., Ex. F at 28-2).

After completing a full review of the medical records, including reports from Mehdi Khan, D.O.

(Plaintiff's treating ophthalmologist and retinal specialist), Ramakrishna Ratnakaram, O.D.,

M.D. (Plaintiff's treating ophthalmologist and retinal specialist), Andrew Siedlecki, M.D.

(Plaintiff's treating ophthalmologist), Dr. Suda (Plaintiff's treating optometrist), Sarah Martin,

RN (Unum Clinical Consultant), Deb Donohue, RN, BSN (Unum Senior Clinical Consultant),

and Dr. Antaki (Unum OSP), Dr. Eisenberg concluded on March 10, 2021, that he concurred

with Dr. Antaki and did not find continued support for visual restrictions and limitations that

would preclude Plaintiff from performing the full-time duties of his occupation. This opinion

was based on his knowledge and experience as an ophthalmologist who has practiced for more

than 35 years (Claim File at 503-504; Rupp. Dec., Ex. F at 29). Dr. Eisenberg noted that the

typical period of adjustment to new, functional monocularity is three to six months with the vast

majority of individuals able to resume full work activities in this period or within one year, and

that Plaintiff's self-reported symptoms such as fatigue and headache are not typical features of

monocularity beyond the above-stated adjustment period. (Claim File at 504, Rupp. Dec., Ex. F

at 53-54, 72). As to headaches and fatigue, more binocular vision patients report those

symptoms than those who are monocular, which means that monocular vision is not necessarily

the cause of headaches and fatigue. (Rupp. Dec., Ex. F at 72).

To assess the Plaintiff's condition and validity of the claimed restrictions and

limitations at the time, Unum's Senior Vocational Rehabilitation Consultant, **Mary Cloutier,**

**M.A., CDMS, CRC**, performed an occupational analysis on March 25, 2021. Ms. Cloutier

reviewed the records, objective findings, and all prior opinions and conclusions, including Dr.

Eisenberg's conclusion that Dr. Suda's disability determination appeared to be based primarily

on Plaintiff's self-reported symptoms.  (Claim File at 505-507; Rupp Dec., Ex. D at 34, 55-56, 106, 118-119, 140-14, 143, 173-74).  After conducting a detailed review of all of the occupational and vocational evidence available to her, including information provided by Plaintiff and an analysis of restrictions and limitations set by medical and clinical personnel, Ms. Cloutier determined that the demands of Plaintiff's occupation did not exceed his functional capacity.  (Claim File at 505-507; Rupp Dec., Ex. D at 140).

Next, on March 29, 2021, having received opinions from Unum's internal clinical consultants, including OSP Dr. Antaki, Unum's DMO Dr. Eisenberg, and Unum's vocational consultant Mary Cloutier, Unum's disability benefits specialist Glenda Alin determined that Plaintiff no longer met the Policy's definition of total disability or the definition of residual disability because there was no medical support for his alleged inability to perform his own occupation. (Claim File at 508-509; Rupp Dec., Ex. B at 74, 83, 168).

Lastly, on March 31, 2021, based on all the above information and the information provided by Plaintiff, Unum determined that Plaintiff was able to perform the duties of his occupation and that the only restrictions and limitations that were supported pertained to depth perception, stereopsis, and binocular vision, which were not relevant to his occupation as an audit partner.  (Claim File at 525-531).  As a result, Unum stopped paying benefits and closed the claim.

## 2) Appeal Process

Plaintiff timely appealed on September 20, 2021 (Claim File at 707-709), and submitted new information, including (1) a two-day Specific Skills Assessment performed by **Townsend Learning Center** on August 4-5, 2021 (Claim File at 752-759), and (2) an

8

Occupational Analysis and Labor Market Survey performed by **Seacoast Rehabilitation** on August 16, 2021 (Claim File at 761-800).  In sum, these reports indicated that Plaintiff could not meet the physical demand required by his occupation as an audit partner at EY.

To analyze the new information it received, Unum asked Senior Vocational Rehabilitation Consultant **G. Shannon O'Kelley, M.Ed., CRC, CEAS** to conduct a vocational analysis, which included a review of the reports submitted by Townsend Learning Center and Seacoast Rehabilitation.  Ms. O'Kelley found the expert opinion of Townsend Learning Center unconvincing and unreliable, concluding "the results were anecdotal, and the evaluation was not standardized."  (Claim File at 863).  As to the Seacoast Rehabilitation report, Ms. O'Kelley determined that even though the survey of eight employers done by Seacoast indicated a requirement of "fine" depth perception, stereopsis, or binocular vision for his occupation, the DOT and O*NET information for the occupation indicated that depth perception was **not** required or **not** important respectively for the DOT and O*NET.  As a result, Ms. O'Kelley concluded that the newly submitted vocational information by Plaintiff did not alter Unum's prior vocational conclusion.  (Claim File at 863).

Unum then had an internal medical review completed by **Scott B. Norris, M.D., MPH** (Family and Occupational Medicine) on October 21, 2021.  Although Dr. Norris completed a full review of the medical records, including clinical and medical reviews, summaries, and documents prepared by others, he also performed his own independent analysis of the records and formed his own conclusions.  (Claim File at 870-872).  Dr. Norris opined, to a reasonable degree of medical certainty, that the medical evidence did not support restrictions and limitations that would preclude Plaintiff from performing the strength, positional, travel, or cognitive demands of his occupation.  (Claim File at 870-872).

Finally, Unum obtained an independent review by a board-certified ophthalmologist, **Sami Kamjoo, M.D.**, who reviewed all the medical and clinical evidence and concluded that Plaintiff was able to read and use a computer with the intact function of the right eye.  Dr. Kamjoo agreed with the prior reviews that restrictions and limitations were not supported for Plaintiff's occupational demands.  (Claim File at 877-878).

### 3)  Clash of Experts

As is clear, multiple experts from both sides were involved and had differing opinions when the Plaintiff's benefit claim was reviewed by Unum.  This includes at least **two** vocational specialists, **four** medical doctors (two of them specializing in ophthalmology), and **one** registered nurse from Unum's side; **one** doctor of optometry and **two** vocational experts from Plaintiff's side.

In support of his motion for summary judgment, Plaintiff submitted the declaration of **Mehdi Khan, D.O., FACS**.  Dr. Khan opined that there is a "reasonable degree of medical certainty that Plaintiff's inability to perform sustained reading without eye fatigue, headaches, and blurry vision is a result of the September 2017 macula-off detachment of his retina in his left eye and his need to read with only one good eye."  (Khan Dec., Dkt. 32-29 at ¶ 24).  Unum, in response, has submitted the declaration of Rachel Duchon.  In her declaration, Ms. Duchon opines that Mr. Schmidt can perform the material and substantial duties of his occupation despite the loss of vision as his vocation does not require binocular vision.

Multiple experts are involved in this case with opposing opinions.  It is not the job of this Court to make credibility determinations on summary judgment or to decide who is right and who is wrong—that analysis should be left to the jury.  On this basis, it respectfully is

submitted that Plaintiff's motion for summary judgment as to its entitlement to residual disability benefits should be denied in its entirety.

**B.  There are Genuine Issues of Material Fact as to Whether Mr. Schmidt's Alleged Restrictions and Limitations Qualify for Residual Disability**

When a plaintiff's eligibility for residual disability benefits hinges on a medical determination of his alleged disability and medical experts are in dispute, summary judgment is inappropriate. *See Rich v Tee Bar Corp.,* 2013 US Dist. LEXIS 10682, at *23 (N.D.N.Y. Jan. 28, 2013, No. 1:10-CV-1371 (MAD/CFH)) (conflicting expert opinions preclude summary judgment and existence of conflict in the medical opinions of the parties' experts is sufficient to raise an issue of material fact); *Augustine v. Hee,* 161 Fed. App'x 77, 79 (2d Cir. 2005) (evaluations of doctor's testimony should be addressed by the factfinder); and *Napoli v. First Unum Life Ins. Co.,* 78 Fed. App'x 787 (2d Cir. 2003) (summary judgment is inappropriate in benefits disputes involving dueling medical experts where the resolution of the case depends on the Court adopting one expert's opinion over another's).

Plaintiff argues that Plaintiff qualifies for residual disability benefits because he is unable to perform one or more of the material and substantial duties of his occupation for as long as normally required due to loss of vision in his left eye.  Plaintiff's main supporting argument is that he cannot do more than four to five hours of reading in a day whereas his duties require him to do six to seven hours or even ten hours during the busy season.  Plaintiff further contends that he cannot visit client offices to perform on-site audits as the client sites do not accommodate his disability due to space limitations.

Plaintiff's argument oversimplifies the analysis required to determine if one qualifies for residual disability.  Determining if an applicant meets the criteria for a residual

11

disability requires a factual analysis of medical reports and circumstances surrounding the applicant. For example, when Unum reviews residual disability claims, the factors it considers are (1) whether it is medically supported that the insured's disability limits his performance; (2) whether the specific restrictions and limitations affect the insured's ability to do his job; and (3) even if there is medical support for restrictions and limitations, do those specific restrictions affect the insured's ability to do his job. (Rupp Dec., Ex. B at 180-187).

Unum's medical experts have opined that the medical evidence did not support Plaintiff's alleged restrictions and limitations if he has one functional eye with good vision. (Duchon Dec. at ¶ 19, Rupp Dec., Ex. F at 73, 76, Ex. D at 145, Claim File at 503, 506, 863-64, 872, and 877). In fact, well over 90% of the patients who suffer from vision loss in one eye can resume daily activities and vocational activities without difficulty. (Rupp Dec., Ex. F. at 54). Even Plaintiff's treating optometrist, Dr. Amy Suda, does not dispute that the Plaintiff has good vision in his right eye. (Claim File at 466, 469-470, Rupp Dec., Ex. E. at 33-34). The conflicting medical opinions are further demonstrated by Dr. Suda's belief that Plaintiff is one of the relatively rare cases involving patients who find it hard to adapt to changes ("[t]hough some may be able to adapt to the loss of vision in one eye, you cannot predict which individuals will adapt enough to not find it limiting" [Claim File at 469)], as compared to Drs. Antaki and Eisenberg who believe, to a reasonable degree of medical certainty, that it is overwhelmingly likely that Plaintiff has adapted to his new monocular state as most patients do.

Also, Unum's vocational consultants have concluded that Plaintiff's occupation as an audit partner does not require fine-depth perception or binocular vision, as there is no requirement to have binocular vision when reading documents or computer screens. (Claim File at 506, 863.) This contrasts with findings made by the Plaintiff's vocational experts who opined

that the role of audit partner requires having fine-depth perception and binocular vision (Claim

File at 761).

In summary, substantial material factual disputes make this case unfit for

summary judgment.

### C. There is Sufficient Evidence in the Record to Show that Plaintiff Could Have Performed the Material and Substantial Duties of His Occupation with Monocular Vision

Plaintiff's key argument supporting his disability claim is that he cannot do more

than five hours per day of critical reading or review spreadsheets without incurring fatigue and/or

debilitating headaches in a job that he claims requires sustained critical reading for 6-7 hours per

day during non-peak times and for 10-12 hours per day during peak times.  (Schmidt Dec., Dkt.

32-30 at ¶ 18).  He further claims that his need for adaptive measures such as larger computer

screens cannot be accommodated at client sites where he spends 60 to 70% of his working hours

on audit engagements.  (Schmidt Dec., Dkt. 32-30, at ¶ 19).  However, Plaintiff's deposition

testimony paints a somewhat different picture that requires a determination by a jury, not the

Court on summary judgment.

### 1) Plaintiff has Demonstrated that he Could Adequately Perform his Job

After Plaintiff suffered a detached retina in his left eye that left him with monocular vision, he was able to perform the required tasks in the 15-month window from the time of his injury until the time of his departure from EY. (Rupp Dec., Ex. A at 167: "I was able to [] perform the [] duties on a sort of adjusted schedule on a basis that took more time to complete procedures with as well as with time off for the various procedures and surgeries that I had, you know, during that timeframe." (Rupp Dec., Ex. A at 198). When asked if there was a task Plaintiff could not do at all, Plaintiff testified "Could not do at all? I – no, I think I was able to do things. It just – again, it took longer to complete those – to complete those steps and whether or not I was doing them as – as effectively as I – as I had prior, I – I would question that."[3] Id.

It is important to note that an alleged loss of efficiency in performing one's job duties does not trigger residual disability benefits under the Policy. (Claim File at 218). Scott Shea, Lead Disability Benefits Specialist, in his report stated: "based on my reading of the [residual disability] definition, the insured does not have a loss of material or substantial duties . . . nor has he claimed that he was not able to work as many hours as he did. To the contrary, he may have been working more hours, albeit with breaks, to make up for slowness." Id. The second portion of the definition of residual disability requires the claimant to be unable to perform his duties for as long as is normally required, which means that the insured would need a loss of time worked due to disability, not that the insured is working less efficiently, or that he has less work to do. (Claim File at 221, Rupp Dec., Ex. C at 71-72: "[T]he policy doesn't

---

[3] This contradicts Plaintiff's argument that he cannot do critical reading more than five to six hours per day, as he demonstrated that he can work longer than usual to finish his task with only one good eye.

cover the less efficient or [time spent] less effectively; it covers the [] loss of time"; *see also* Policy at 163)  There is a significant factual dispute as to whether Plaintiff was residually disabled to the point that he could not finish the required tasks when he testified that he was able to perform all required tasks, albeit with minor difficulties.

### 2)  It is Disputed Whether Plaintiff was Able to Bring Adaptive Measures to Client Sites

Another fact Plaintiff relies on for his claim to residual disability benefits is that he could not bring adaptive measures to his client sites where he claimed to have performed the majority of his work.  (Rupp Dec., Ex. A at 176).  After Plaintiff suffered his eye injury, EY provided a large monitor to accommodate his vision needs.  (Id. at 172).  While utilizing these monitors helped, Plaintiff claims they did not resolve the issue because, according to him, the monitors were not portable, and his client sites could not accommodate them. (Id. at 174).

However, a material factual dispute exists as to whether Plaintiff's claimed impossibility of taking a large monitor to a client site is accurate or reliable.  Plaintiff testified that he was able to take heavy equipment like a printer (Id. at 37-38), desktop computer (Id. at 36),[4] monitor, keyboard (Id. at 36), and paper documents in an audit bag (Id. at 54) to client locations in the 1990s up until recently.  The large monitor that was given to Plaintiff was three or four times as big as a laptop screen (Id. at 175-76), which could be lifted by Plaintiff (Id. at 176) and connected to his laptop via a cable (Id. at 176).  Plaintiff claims that some client sites could not accommodate his monitor as audit spaces can be limited.  (Id. at 176-77).  Plaintiff's position in this regard is as hypothetical as it is self-serving because he never tried to take the large monitor to a client site to see if it worked out (Id. at 182).  A genuine issue of material fact

---

[4] According to David Schmidt, the desktop computer he used in the 90s that he brought to client sites was a 12" by 12" box-size Apple computer. (Rupp Dec., Ex. A at 36)

exists as to whether Plaintiff was hindered in bringing his monitor to a client site to accommodate his disability.   A reasonable jury could believe that Plaintiff could have done so through various means such as asking the client to provide a bigger space or bigger desk to carry out his audit work, asking his colleagues to help him with carrying the monitor, setting up a workspace that could accommodate the use of big monitors, among other things.  It is up to a jury to decide whether to believe that although Plaintiff could bring desktop computers, a printer, a big audit bag, and other items to the client site, he could not also have brought a special monitor—which he stated he could carry by himself—to accommodate his special needs.

Indeed, Plaintiff worked at client sites after the injury without any substantial difficulty that made him unable to work at the site.  During his deposition, Plaintiff testified that after the injury, he performed an audit at GateHouse Media in Pittsford, New York where he drove to the site by himself a couple of times a week.  (Id. at 171).  He also testified that he audited the books at Ecology and Environment, which also required a lot of on-site work.  (Id. at 171-172).

Unum's determination that Plaintiff was not restricted or limited from working at client sites despite the injury to his left eye has support in the record, including from Plaintiff himself.  Whether Plaintiff could not perform the duties of his occupation due to an alleged inability to accommodate for his disability should be left for the jury to determine.

### D. There is a Dispute as to Whether Plaintiff's Departure from EY, and thus his Loss of Earnings, was Caused by his Alleged Disability

While Plaintiff claims that he left EY due to his alleged disability, the facts do not support anything other than a subjective move on his part.  Plaintiff never suffered a pay cut after the injury (Id. at 193) and experienced no diminution in profit distribution.  (Id.).  Overall, he did

not receive any diminished reward or payment because of his injury during his stay at EY. (Id.). No one at EY told Plaintiff that his disability was affecting his performance to deliver work product in a timely and efficient manner, that he should depart or resign, or that he should seek another position at EY. (Id. at 169). Plaintiff generally described additional burdens in getting the work done, but he did not testify that there was an instance where he could not deliver the work or meet the expectations of EY or its clients because of his injury. (Id. at 167). In fact, EY was very accommodating as far as Plaintiff could recall (Id. at 169), and no complaints were lodged against Plaintiff from his colleagues or clients as to his self-adjudged loss of efficiency. (Id. at 170).

Here, summary judgment cannot be granted because there are disputed issues of fact relating to the reason for Plaintiff's resignation from EY. Unum disputes that Plaintiff's departure and subsequent loss of earnings was due to his disability, as his workplace was very accommodating of his limitations, and the apparent inability to work at EY was self-perceived by Plaintiff.

## ARGUMENT II

### UNUM HAS NOT ACTED IN BAD FAITH IN DETERMINING PLAINTIFF'S ELIGIBILITY FOR DISABILITY BENEFITS, AND UNUM WAS NOT INVOLVED WITH EY'S DECISION UNDER ITS OWN PROGRAM

#### A. Plaintiff Failed to Make a Prima Facie Showing of Unum's Alleged Bad Faith in Denying Plaintiff's Disability Claim, Precluding Summary Judgment

Plaintiff argues that Unum breached the implied covenant of good faith and fair dealing by "manufacturing factually incorrect reasons" to deny Plaintiff's claim for disability benefits and that Unum's actions not only deprived Plaintiff of residual disability benefits under Unum's Policy, but also costs him additional benefits under an entirely separate EY partner

17

disability benefits program over which Unum exerts no control.  In support of his argument,

Plaintiff cites cases such as *East Ramapo Cent. Sch. Dist. V. New York Sch. Ins. Reciprocal,* 199

A.D.3d 173 (2d Dep't 2021) (trial court erred in dismissing an insured's claim against its insurer

for breach of the implied covenant of good faith and fair dealing), *McBride v. New York Prop.*

*Ins. Underwriting Ass'n,* 152 A.D.3d 505 (2d Dep't 2017) (denying motion to dismiss claim for

breach of the implied covenant of good faith and fair dealing based on insurer's failing to

properly inspect and appraise damage), *25 Bay Terrace Assocs., L.P. v. Pub. Serv. Mut. Ins. Co.,*

144 A.D.3d 665 (2d Dep't 2016) (claim stated for failure to act in good faith where insurer sent

engineer to inspect building and repair report, which was factually inaccurate, to support its

denial of insurance claim).  However, these cases are inapposite because they deal with an

insurer's *motion to dismiss* an insured's claim, not the award of summary judgment in an

insured's favor.

  "To establish an insurer's bad faith, the insured must demonstrate that 'no

reasonable carrier would, under the given facts' deny coverage." *Sunrise One, LLC v*

*Harleysville Ins. Co. of NY,* 293 F. Supp. 3d 317, 328 (E.D.N.Y. 2018) (quoting *Sukup v. State of*

*New York,* 19 N.Y.2d 519 (N.Y. 1967).  While several courts have acknowledged a cause of

action for extra-contractual damages for a bad-faith denial of coverage, they have "generally

found that the plaintiff was unable to meet the high standard to prevail on such a claim." *Utica*

*Mut. Ins. Co. v Fireman's Fund Ins. Co.,* 283 F Supp 3d 314, 329 (NDNY 2017), *see Ebrahimian*

*v. Nationwide Mut. Fire Ins. Co.,* 960 F. Supp. 2d 405, 416 (EDNY 2013) (collecting cases).

"Proof of an insurer's bad faith 'requires an *extraordinary showing of disingenuous or dishonest*

*failure* to carry out a contract.'" *Dawn Frosted Meats, Inc. v Ins. Co. of N. Am.,* 99 A.D.2d 448,

448 (1st Dep't 1984) (citing *Gordon v. Nationwide Mut. Ins. Co.,* 30 N.Y.2d 427, 437) (emphasis

added). A mere difference of opinion between an insurer and an insured over the availability of coverage is insufficient. *Sunrise One, LLC,* 293 F. Supp. 3d 317, 328 (EDNY 2018) (quoting *Sukup v. State of New York,* 19 N.Y.2d 519 (N.Y. 1967). In *Sunrise One,* the District Court for the Eastern District of New York found that there was no genuine issue of material fact regarding defendant insurer's good faith in assessing plaintiff Sunrise's claims and denying coverage. It found that the uncontroverted evidence establishes that the insurer was diligent in its efforts to assess plaintiffs' claims as soon as possible and retained an independent adjuster to inspect the claim. The court found that there was no genuine dispute that the defendant insurer investigated plaintiff's claims and denied coverage in good faith as defendant insurer's coverage denial was based on the opinions of an engineer and a building consultant who independently determined that the damage was not caused by Hurricane Sandy that would have been covered under the policy, but rather was a pre-existing condition. Id.

As is seen from the authorities cited above, the need to prove an insurer's bad faith in denying an insurance claim is very high, and a simple mistake or negligence by the insurer alone is not enough to support such a finding. Even if Unum wrongly terminated Plaintiff's benefits (which is denied), Plaintiff must show that no reasonable carrier would do so under such circumstances. *Sunrise One, LLC* 293 F. Supp. 3d 317, 328 (E.D.N.Y. 2018) Plaintiff primarily relies on minor factual inconsistencies set forth by Unum's reviewing consultants and medical and vocational professionals in reviewing Plaintiff's claim (which, in and of themselves demonstrate material factual issues requiring denial of Plaintiff's motion), such as that they allegedly ignored or misread minor variations in Plaintiff's vision measurements between May 2019 and November 2020 and allegedly misread Plaintiff's statement as to when he purportedly resumed driving. However, these mistakes, even if made

19

(which Unum denies), are not significant enough to render the whole judgment invalid or to demonstrate a conscious and knowing indifference to Plaintiff's rights. Drs. Eisenberg and Antaki testified that Plaintiff's condition no longer supported restrictions and limitations because of their fair assessments that Plaintiff's right eye was sufficient to perform the required tasks for a prolonged period because Plaintiff's work did not require fine-depth perception. (Rupp Dec., Ex. E at 97, Ex. F at 49 – 53). As to Plaintiff's statement that there was no improvement in his condition between November 2019 and November 2020, Plaintiff's near vision in his right eye improved from J5 to J3—which allows Plaintiff to read something at 14 inches (Claim File at 415; Rupp Dec., Ex. E at 71-73). Moreover, Dr. Eisenberg testified that there is wide variability in the assessment of near vision based on conditions, and the difference between J2 and J3 is negligible enough that it falls within the accepted variations. (Rupp Dec., Ex. F at 42-45). Indeed, the fact that Plaintiff retained visual acuity in his right eye is not disputed. As to the resumption of driving activities, Dr. Eisenberg saw it as a sign of adaptation, even though it happened before Plaintiff originally was approved for and received disability benefits. (Rupp Dec., Ex. F at 56). The very fact that Plaintiff was able to drive was interpreted as a sign of adaptation to his monocular vision. Moreover, Unum's decision to terminate Plaintiff's benefits had nothing to do with Plaintiff's ability to drive. (Rupp Dec., Ex. B at 123).

Also, as is set forth extensively above and in the Claim File, Unum went through multiple layers of evaluations and reviews before it decided to terminate Plaintiff's benefits. The opinion of Dr. Antaki, Unum's OSP, that Plaintiff's condition did not support restrictions and limitations came after an extensive review of Plaintiff's file. He even contacted Dr. Suda, Plaintiff's treating optometrist, because they disagreed on the interpretation of Plaintiff's symptoms. (Claim File at 469-470). When Dr. Antaki could not resolve the disagreement, he

20

called in Dr. Eisenberg, Unum's DMO and a board-certified ophthalmologist, to evaluate the issue and opine. (Rupp Dec., Ex. E at 36, 65-66). This is not to mention vocational specialists like Mary Cloutier, who was involved in the process of evaluating Plaintiff's job requirements and who determined that Plaintiff's job did not require depth perception that comes from two fully functional eyes (Rupp Dec., Ex. D at 36-37, 76, 139-140).

The detailed review done by Unum on Plaintiff's administrative appeal should not be overlooked either. When Plaintiff provided new supporting evidence from his experts, Unum involved internal and external consultants and professionals who were not involved in the initial decision. As explained, Unum obtained reviews from Ms. O'Kelley, Dr. Norris, and Dr. Kamjoo, whose reviews included all the new evidence that Plaintiff had attached as part of the appeal. They all independently reached the same decision as Dr. Antaki, Dr. Eisenberg, and Ms. Cloutier did in the initial review.

Plaintiff has put forth no admissible proof to show that Unum deliberately manufactured factually incorrect details to deprive Plaintiff of his entitlement to benefits other than his own unsubstantiated and conclusory statements. To the contrary, the record is full of hundreds of pages of evidence demonstrating the lengthy extent to which Unum went to evaluate Plaintiff's claim before it decided to terminate Plaintiff's benefits. Defendants made a documented good faith effort, and Plaintiff's motion in this regard must be denied.

### B. Plaintiff Failed to Demonstrate a Prima Facie Entitlement to Consequential Damages

"Although courts in this Circuit acknowledge that an insured can theoretically recover consequential damages from an insurer in a breach of contract action, they [']have generally found that the plaintiff was unable to meet the high standard to prevail on such a

claim.[']" *Sunrise One,* 293 F. Supp. 3d 317, 328 (E.D.N.Y. 2018) (granting summary judgment

to the insurer on the insured's claim for business income losses, consequential damages, and

attorney's fees and costs) (citing *Ebrahimian v. Nationwide Mut. Fire Ins. Co.,* 960 F. Supp. 2d

405, 416 (E.D.N.Y. 2013)).  To the extent that Plaintiff claims that he is owed damages on the

basis of Unum's bad faith, it is well settled that "New York law does not permit the recovery of

consequential damages, which are 'extra-contractual' in nature, owing to 'an insurer's bad faith'

in honoring the policy. . . [r]ather, New York law *only permits* such recovery where consequential

damages are specifically contemplated by both parties at the time of contracting."  *Cohen v.*

*Narragansett Bay Ins. Co.,* 2014 U.S. Dist. LEXIS 134092, at *4 (E.D.N.Y. Sep. 23, 2014, No.

14-CV-3623 (PKC)) (internal citation omitted) (emphasis added);  *see also Valentini v. Group*

*Health Inc.,* 2021 U.S. Dist. LEXIS 112081 (consequential damages unavailable where the

policy was devoid of any sort of specific provision permitting recovery for the loss in the event

of a delay or improper coverage decision).

   Here, Plaintiff claims entitlement to consequential damages for Unum's alleged

breach of the implied covenant of good faith and fair dealing because Plaintiff allegedly lost

benefits under the separate EY disability program based on Unum's determination to terminate

benefits to Plaintiff.  Specifically, Plaintiff claims that the parties must have contemplated the

probable result of a breach at the time of or prior to contracting without providing any evidence

of that contemplation other than the argument that Unum should have foreseen it.  Plaintiff has

not even argued or provided any evidence whatsoever that consequential damages were

specifically contemplated between *Plaintiff* and Unum.

   Plaintiff's argument that Unum directly controls EY's benefit program with the

Advice to Pay letter is unavailing.  Plaintiff bases this argument on the belief that EY mirrors

Unum's decision as to benefits because EY does not conduct its review of disability claims. This is simply false. EY benefits scheme and Unum's scheme cover two separate areas—EY for short-term disability and Unum for long-term disability. (Rupp. Dec., Ex. G at 57). According to Brian Cox, Executive Director of TBG West—the insurance broker—EY accepts Unum's determination for validating short-term disability, but Unum does not control EY's decision. Id. Plaintiff has not produced any evidence that Unum owns or controls the EY disability benefit scheme but instead relies on his assertion that Unum had made benefits determinations for the EY disability benefit program since 1996. Unum's own EY disability benefit guidelines plainly demonstrate that the EY benefit program is a "self-funded and self-administered disability plan" (Dkt. 32-27 at p. 1). Glenda Alin, Unum's disability benefit specialist, was not aware of any scenario where EY would mirror its decision based on Unum's determination. (Rupp Dec., Ex. B at 199 – 201). No one from Unum told EY what to do, and Unum had no authority to direct EY to an outcome. (Rupp Dec., Ex. C at 177-78). Unum's Advice to Pay letter was simply a letter informing EY as to the decision it made based on its evaluation of all of the medical and vocational information at hand and the terms and conditions of the Policy without knowledge or consideration of any terms or conditions of EY's disability program.. (Rupp Dec., Ex. C at 178). In fact, the letter is drafted in an informative tone, not in a way that orders or directs EY to take certain action on Unum's advice. (Rupp Dec., Ex. H at 3). The fact that EY has typically respected Unum's opinion and mirrored Unum's decision in administering its own separate benefit program is not evidence that EY was under the control of Unum, and especially is not evidence that Unum and Mr. Schmidt had specifically contemplated extracontractual damages at the time the Policy was issued.

## <u>CONCLUSION</u>

Plaintiff's motion for summary judgment should be denied in its entirety because Plaintiff failed to meet his prima facie burden of showing that no genuine material issue of fact exists. This case involves disagreements between medical experts in interpreting Plaintiff's subjective self-reported symptoms. Unum relied on multiple layers of expert review and considered the opinions of Plaintiff's experts before terminating benefits. This case involves a quintessential battle of the experts. Whether Plaintiff was able to perform the material and substantial duties of his occupation is ripe for a jury to decide and should not be resolved on summary judgment. Unum's exhaustive review process debunks Plaintiff's claim that Unum "fabricated" evidence in bad faith to deprive Plaintiff of his right to disability benefits. Therefore, Plaintiff's motion seeking summary determinations based on his allegations of bad faith, breach of the implied covenant of good faith, and entitlement to consequential damages also should be denied.

Dated: May 3, 2024
     Buffalo, New York

                    **RUPP PFALZGRAF LLC**
                    Attorneys for Defendants, Provident Life
                    and Casualty Insurance Company and Unum Group

By: _____
                    R. Anthony Rupp III, Esq.
                    Matthew D. Miller, Esq.
                    Young Woo Kim, Esq.
                    1600 Liberty Building
                    Buffalo, New York 14202
                    Telephone: (716) 854-3400
                    Rupp@RuppPfalzgraf.com
                    Miller@RuppPfalzgraf.com
                    Kim@RuppPfalzgraf.com